**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **K.W. MICHAEL CHAMBERS,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 07-0373-WS-B** |
| | ) | |
| **MICHAEL J. COONEY, M.D.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter comes before the Court on defendant Michael J. Cooney, M.D.'s Motion to Dismiss or Stay, or in the Alternative, to Transfer (doc. 13).[1] The Motion has been extensively briefed and is ripe for disposition at this time.[2]

**I.    Background.**

**A.    The Alabama Action.**

On May 22, 2007, plaintiffs, who are 15 former stockholders of a company called InnoRx, Inc., filed suit against defendant, Michael J. Cooney, M.D., in this District Court (the

---

[1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

[2]    Also pending is Plaintiffs' Motion for Oral Argument (doc. 18), which defendant has opposed. The Motion for Oral Argument reads more like a sur-reply than a request for hearing; moreover, this Motion offers no explanation why the sorts of detailed factual determinations identified therein are necessary at this nascent stage of the litigation. In any event, the parties' filings on the Motion for Oral Argument suggest that while they may disagree in how they characterize certain facts, there are no factual disputes that require resolution in order to resolve the Motion to Dismiss. In the undersigned's view, an evidentiary hearing would serve no constructive purpose at this point. Further, the parties' briefs have ably set forth their respective positions on the legal issues pertaining to defendant's request for dismissal, stay and/or transfer, so oral argument is unnecessary. Pursuant to Local Rule 7.3, the Court may in its discretion rule on any motion without oral argument. Because the undersigned is of the opinion that oral argument would not substantially assist the Court in understanding the parties' respective legal arguments, Plaintiffs' Motion for Oral Argument is **denied**.

"Alabama Action").[3]  The lead plaintiff is K.W. Michael Chambers ("Chambers"), who became "the new Stockholder Representative" for plaintiffs effective on the date that this Complaint was filed.  (Complaint, ¶ 1.)  In this capacity, Chambers has been authorized by the other former stockholders to act as their representative and attorney-in-fact in connection with matters relating to the 2005 merger between InnoRx and a company called SurModics, Inc. ("SurModics"), which is not a party to this action.[4]  The 23-page Complaint weaves a complicated, factually dense tale playing out over an eight-year period.  A close review of those allegations is necessary to a full understanding of the issues presented in defendant's Motion.

The Complaint identifies causes of action against defendant, Michael J. Cooney, M.D. ("Dr. Cooney"), for declaratory judgment and tortious interference with contractual relations, all relating to the merger between InnoRx and SurModics.  According to the Complaint, plaintiff Eugene de Juan, Jr., M.D. ("Dr. de Juan") founded InnoRx in 1999 to commercialize certain technologies that he had invented for the treatment of eye disease while on the faculty at Johns Hopkins University in Maryland.  Chambers served as President and CEO of InnoRx from 1999 until the merger of InnoRx and SurModics in January 2005.  (Complaint, ¶ 12.)  The Complaint

---

[3]     Plaintiffs present evidence that nearly one year earlier, on August 7, 2006, they had paid the $350 filing fee and submitted a civil cover sheet to initiate a declaratory judgment action against Dr. Cooney in this District Court.  (Chambers Aff., at Exh. A.)  However, plaintiffs never filed the complaint at that time because they opted "to see if there was any point to further settlement negotiation."  (Knight Aff., at 2.)  Because that complaint was never filed or served, and because that action was withdrawn and its case number reassigned, the unfiled August 2006 complaint lacks legal or equitable significance for purposes of evaluating Dr. Cooney's Motion to Dismiss, Stay or Transfer.

[4]     The 15 former stockholders of InnoRx who are plaintiffs in this action consist of the following: Chambers, Hon. Rosemary de Juan Chambers, Nancy Carmen Oppenheimer 2000 Irrevocable Trust, James Harris Oppenheimer 2000 Irrevocable Trust, Ana Carmen Chambers 1996 Irrevocable Trust, Sarah Camille Chambers 1996 Irrevocable Trust, Otto J. Semrow Declaration of Trust, Elena Vaughan de Juan Irrevocable Trust, Elizabeth Anna de Juan Irrevocable Trust, Eugene de Juan III 2000 Irrevocable Trust, Emily Rose de Juan 2000 Irrevocable Trust, Richard Chandler de Juan 2000 Irrevocable Trust, Eugene de Juan Jr., M.D., Elizabeth Robison de Juan, and the John Hopkins University.  They will be referred to collectively herein as "the Former Stockholders" or "plaintiffs."  Prior to May 22, 2007, the Complaint reflects, Eugene de Juan Jr., M.D., a resident of California, had been the designated Stockholder Representative.  (Complaint, ¶¶ 1-2.)

alleges that Dr. Cooney was a paid part-time consultant for InnoRx until 2001, when Dr. de Juan's team relocated from Johns Hopkins to the University of Southern California and Dr. Cooney left for a position at Duke University. (*Id.*, ¶ 16.) The Complaint alleges that after this split, InnoRx performed development work for a new "helical coil" technology that InnoRx had licensed from Johns Hopkins following Dr. Cooney's departure for Duke. (*Id.*)[5] Plaintiffs maintain that this technology became the centerpiece of InnoRx and the engine driving that company's value, ultimately culminating in the SurModics merger in 2005. (*Id.*, ¶ 17.) Nonetheless, the SurModics merger included all InnoRx technology and was not confined simply to the helical coil invention. (*Id.*, ¶ 18.)

Plaintiffs contend that Dr. Cooney's work for InnoRx was focused on other technologies (not helical coil) and that Dr. Cooney performed no work on the helical coil from mid-2001 through the January 2005 merger. (*Id.*, ¶ 19.) The Complaint also references a September 2000 Consulting Agreement between Dr. Cooney and InnoRx, pursuant to which Dr. Cooney agreed that all inventions and intellectual property he created, developed or invented in providing services to InnoRx would be the exclusive property of InnoRx. (*Id.*, ¶ 30.) According to the Complaint, neither the Consulting Agreement nor any other agreement awarded Dr. Cooney an equity share or financial stake in InnoRx. (*Id.*, ¶¶ 36, 41.)

In January 2005, SurModics, a Minnesota-based company, acquired InnoRx for cash and other considerations whose present-day value totals approximately $38.7 million. (*Id.*, ¶ 42.) In Section 6.2 of the Merger Agreement, the Former Stockholders agreed to indemnify and hold harmless SurModics from any action, proceedings, claim or demand by any third party, with SurModics having the right to withhold future contingent payments (linked to certain developmental milestones) under certain circumstances to secure the Former Stockholders' performance of this obligation. (*Id.*, ¶¶ 43-44.) Shortly after the merger was announced, the Complaint alleges, Dr. Cooney contacted Dr. de Juan to claim an equity share of InnoRx and a portion of the merger proceeds. (*Id.*, ¶ 46.) Since that time, plaintiffs contend, Dr. Cooney has

---

[5]     As explained in the pleadings, this helical coil technology is an implant designed to deliver medication directly to the back of the eye in focused therapeutic dosages, as an alternative to less efficient oral formulations.

launched a campaign of disruption by threatening to sue SurModics, Johns Hopkins and Dr. de Juan to invalidate patents owned by or licensed to SurModics via the merger and to claim a portion of the merger proceeds, all with the intent of crippling further development of the helical coil technology unless a "sizeable payment" is made to him.  (*Id.*, ¶ 49.)  Dr. Cooney claims to be a co-inventor of an intravitreal coil patent (the "'750 Patent") and a subretinal drug delivery methodology patent (the "'363 Patent"), as well as an equity stakeholder in InnoRx.  (*Id.*, ¶ 52.) These efforts apparently lasted for more than two years and included accusations directed publicly at Dr. de Juan at a professional gathering in Hawaii.  Ultimately, SurModics placed a large contingent payment to the Former Stockholders in escrow pending a final determination of Dr. Cooney's claims.  (*Id.*, ¶ 59.)[6]  This lawsuit followed in May 2007.

In their declaratory judgment cause of action, the Former Stockholders seek declarations on no fewer than eight topics, including the following: (a) that the expired Consulting Agreement is the only agreement between InnoRx and Dr. Cooney; (b) that Dr. Cooney has been paid in full for services rendered under the Consulting Agreement; (c) that no other agreements afford Dr. Cooney an ownership interest or equity stake in InnoRx or non-party SurModics; (d) that Dr. Cooney is entitled to no proceeds from the InnoRx sale, and to no payments from the Former Stockholders, InnoRx or SurModics; (e) that Chambers, Dr. de Juan and non-parties Dr. Signe Varner and SurModics (as successor to InnoRx) did not defraud Dr. Cooney; (f) that Dr. de Juan and InnoRx breached no fiduciary duties owed to Dr. Cooney; (g) that Dr. Cooney assigned all of his rights to the referenced inventions to Johns Hopkins and agreed to allow Johns Hopkins to be the final arbiter of inventorship rights for those technologies; and (h) that Dr. Cooney has no inventorship rights in any patents that SurModics licensed or acquired in the

---

[6]     According to plaintiff Chambers, the value of this escrowed milestone payment being withheld from the Former Stockholders because of Dr. Cooney's allegations is approximately $3.0 million.  (Chambers Aff., ¶ 7.)  Chambers explains that SurModics is holding that amount to secure the Former Stockholders' indemnity obligation related to Dr. Cooney's claims.  (*Id.*)  Plaintiffs state that future milestone payments whose fate is hanging in the balance pending resolution of the Dr. Cooney issues are valued at approximately $24 million.  (Doc. 16, at 10.)  Thus, Dr. Cooney's claims stand between the Former Stockholders and current and future payments from SurModics of as much as $27 million.  For defendant to suggest in these circumstances that the Former Stockholders lack standing to litigate Dr. Cooney's dissatisfactions or that there is no case or controversy between them is to ignore these realities.

merger.  (Complaint, ¶ 65.)

In their tortious interference claim, the Former Shareholders maintain that by claiming an equity stake in InnoRx and co-inventorship rights in the patents, Dr. Cooney "has, without justification, intentionally interfered with the contractual relationship between the [F]ormer Stockholders and SurModics thereby caus[ing] SurModics to delay the contingent stock payments due the [F]ormer Stockholders under the Merger Agreement."  (*Id.*, ¶ 73.)

### B.   *The Minnesota Action.*

The Alabama Action was not filed in a vacuum; rather, its timing appears to have been driven, at least in part, by discussions between the parties preceding its filing.  Beginning in March 2005, the parties' negotiations had proceeded off and on, including multiple mediations, threats of legal action, settlement proposals and counterproposals, only to become dormant in late 2006.  (Greene Aff., ¶¶ 2-9; Chambers Aff., ¶¶ 10-18.)[7]  Between October 2006 and April 2007, things had become so quiet that Dr. de Juan's counsel "had no idea what had happened with Dr. Cooney and his claims."  (Greene Aff., ¶ 9.)  On May 9, 2007, however, this dispute returned to the front burner when Dr. Cooney's newly hired counsel forwarded a draft complaint to SurModics' counsel.  (Vickrey Decl., ¶ 2.)[8]  Between May 18 and 23, 2007, Dr. Cooney's

---

[7]     Significantly, during these negotiations, Dr. Cooney had repeatedly threatened to initiate judicial proceedings.  As early as January 2006, Dr. Cooney's then-counsel had advised InnoRx's attorney that he was drafting a complaint and identified specific claims and specific dollar amounts that would be sought.  (Chambers Aff., ¶ 11.)  Dr. Cooney's lawyer articulated a similar threat (including assertions that he had no choice but to file suit and that he was drafting a complaint) with respect to SurModics in February 2006.  (*Id.*, ¶ 12.)  In May 2006, Dr. Cooney (by and through counsel) informed InnoRx that he would aggressively pursue this matter after June 7, 2006 if it were not resolved in the interim.  (*Id.*, ¶ 13.)  In short, then, it is clear that Dr. Cooney had been issuing dire warnings of imminent legal action to SurModics and InnoRx for more than a year, but had never followed through.  The events of May 2007 must be viewed through that historical prism.

[8]     For reasons that are unclear, appended to the Vickrey Declaration (doc. 14, Exh. C) is a one-page e-mail exchange between Attorney Vickrey and his client, Dr. Cooney, relating to certain financial terms of the former's engagement to represent Dr. Cooney.  This e-mail is not referenced in the Vickrey Declaration or otherwise labeled; therefore, it is possible that this document was scanned into the court file by defendant's counsel in error.  The Court brings this document to counsel's attention so that, in the event its inclusion was inadvertent, appropriate actions may be taken to avoid or mitigate any waiver of attorney-client privilege that may

counsel had telephonic and electronic contact with the Former Stockholders' counsel; however, there was no discussion of the Former Stockholders' intentions concerning filing suit or of any impending race to the courthouse.  (*Id.*, ¶¶ 3-6.)  On May 23, 2007, the Former Stockholders' counsel informed Dr. Cooney's counsel that the Alabama Action had been filed "late yesterday." (*Id.*, ¶ 6.)[9]

Approximately two weeks later, on June 8, 2007, Dr. Cooney filed his own lawsuit in the United States District Court for the District of Minnesota.  (Vickery Decl., ¶ 8.)  This complaint (the "Minnesota Action") names as defendants SurModics, Dr. de Juan, Johns Hopkins, and two other individuals (Peter Corless and Signe Varner, neither of whom is a party in the Alabama Action), and asserts claims for correction of inventorship on the '750 Patent pursuant to 35 U.S.C. § 256, as well as claims for unjust enrichment, fraud and breach of fiduciary duty.

Not surprisingly, the facts recounted in the Minnesota complaint deviate markedly from those alleged by plaintiffs here.  In particular, Dr. Cooney maintains that he personally "conceived of and documented an intraocular coil for ocular drug delivery" and "concepts for subretinal drug delivery systems" while working with Dr. de Juan at Johns Hopkins.  (Doc. 14, Exh. B, ¶ 13.)  According to the Minnesota complaint, Dr. Cooney conceived of the non-linear drug-delivery ocular implant and its design, and played a key role in reporting the invention to Johns Hopkins in 2000.  (*Id.*, ¶¶ 18-20.)  Dr. Cooney further alleges that he founded InnoRx with Dr. de Juan in 1998, that Dr. de Juan repeatedly promised him and Dr. Cooney's wife that they would share as "partners" in the proceeds of any successes that InnoRx might have, and that Dr.

_____

otherwise attach.

[9]     Although the lawyers on both sides devote a great deal of ink to affidavits and declarations chronicling exactly what was said in these communications prior to and immediately following the filing of this action, there are no allegations and no facts to suggest that plaintiffs' counsel misled or deceived Dr. Cooney's counsel in any way concerning their intentions; rather, there was simply no discussion about whether or when the Former Stockholders intended to file suit until it had already been accomplished.  Nor is there any reason to believe from the evidence that plaintiffs' counsel engaged in stalling tactics or lulling behavior to trick Dr. Cooney's counsel into delaying filing suit until after they had initiated theirs.  The only delay appears to have been by Dr. Cooney's counsel in responding to an information request made by plaintiffs' counsel prior to the filing of any lawsuit anywhere.

de Juan repeatedly urged Dr. Cooney to trust that Dr. de Juan would take care of him notwithstanding his lack of formal equity interest in InnoRx. (*Id.*, ¶¶ 15-17.) After 2002, the Minnesota complaint continues, Dr. de Juan informed Dr. Cooney from time to time that nothing was happening with InnoRx, even as Dr. de Juan and the others worked behind the scenes to erase all traces of Dr. Cooney's inventorship of InnoRx's assets, such as deleting his name from the application for the '750 Patent. (*Id.*, ¶¶ 25-27.) Dr. Cooney claims that he should be named as a co-inventor on numerous InnoRx and SurModics patent applications, because of his contributions to the conception and/or reduction to practice of the inventions set forth in those applications. (*Id.*, ¶¶ 30-39.) The Minnesota complaint further alleges that, in connection with the SurModics transaction, Dr. de Juan "took sole credit for founding and developing InnoRx and for inventing the coil" and that "SurModics expressly acquired InnoRx's liabilities in that transaction, and InnoRx no longer exists." (*Id.*, ¶ 43.)

Based on these factual allegations, Dr. Cooney contends that the Minnesota Action defendants have been unjustly enriched by the value of his intellectual property, his exclusion from these inventions' licensing rights, his contributions to InnoRx for which he was not compensated in the SurModics deal, and the like. (*Id.*, ¶¶ 49-55.) He further alleges that the defendants fraudulently failed to inform him that they were removing his name from the '750 Patent application and deliberately excluding him from the other applications despite his status as a co-inventor. (*Id.*, ¶ 56.) Dr. Cooney also maintains that Dr. de Juan and InnoRx owed him certain fiduciary duties, which they breached in connection with the patent applications and the SurModics transaction. (*Id.*, ¶¶ 59-61.) Lastly, Dr. Cooney requests in the Minnesota Action that the '750 Patent be corrected pursuant to 35 U.S.C. § 256 to reflect his co-inventorship status and that some 15 other pending patent applications submitted by defendants be corrected in the same manner if patents are granted on same. (*Id.*, ¶¶ 63-66.)[10]

## II.    The Motion to Dismiss.

Having reviewed this complex history that involves overlapping litigation pending in this

---

[10]    According to the Former Stockholders' counsel, the Minnesota Action is or may soon be the subject of a motion by SurModics' counsel to dismiss, stay or transfer that case to this District Court. (Doc. 16, at 16 n.4.)

District Court and in federal court in Minnesota, the Court now turns to Dr. Cooney's Motion to Dismiss, which has three prongs.  First, Dr. Cooney requests that the Former Stockholders' declaratory judgment claim be dismissed because (i) it constitutes improper forum-shopping, (ii) the Court should exercise its discretion to decline to hear that claim, and (iii) the claim should be dismissed for want of an actual case or controversy.  Second, he seeks dismissal of the tortious interference claim because (i) under Minnesota law, tortious interference requires a breach of the underlying contract, which has not happened; (ii) there is no admissible evidence of actionable interference by Dr. Cooney; and (iii) this is really the declaratory judgment claim with a different label.  Third, Dr. Cooney seeks transfer of this action in its entirety to the District of Minnesota pursuant to 28 U.S.C. § 1404(a).  The Court will consider each of these bases for relief in turn.

### A.    *The Declaratory Judgment Claim.*

As mentioned, Dr. Cooney seeks dismissal of the declaratory judgment cause of action on several grounds.  In particular, he contends that this action constitutes improper forum-shopping in anticipation of litigation, that other circumstances justify the Court exercising its discretion not to hear the declaratory judgment claim, and that this claim involves issues as to which there is no live case or controversy among the parties.

### 1.    *Discretion and The First-Filed Rule.*

The Former Stockholders' declaratory judgment cause of action was brought pursuant to 28 U.S.C. §§ 2201 *et seq.*, seeking a declaration concerning, *inter alia*, Dr. Cooney's claims of equity interest in InnoRx and co-inventorship status of the inventions that InnoRx transferred or licensed to SurModics in January 2005.  It is well-settled that the Declaratory Judgment Act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).  Indeed, the Supreme Court has "repeatedly characterized the Declaratory Judgment Act as an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant."  515 U.S. at 287 (citations omitted).  As the Eleventh Circuit has observed, the Act "only gives the federal courts competence to make a declaration of rights; it does not impose a duty to do so."  *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir.

2005).[11]

      In evaluating how to exercise this discretion in this action, the undersigned observes that the Alabama Action and the later-filed Minnesota Action include overlapping (but not identical) causes of action and overlapping (but not identical) parties.  As such, this case on its face falls within the boundaries of the so-called "first-filed rule," which provides that "[w]here two actions involving overlapping issues and parties are pending in two federal courts, there is a strong presumption across the federal circuits that favors the forum of the first-filed suit."  *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 (11th Cir. 2005); *see also Merrill Lynch, Pierce, Fenner & Smith v. Haydu*, 675 F.2d 1169, 1174 (11th Cir. 1982); *Marietta Drapery & Window Coverings Co. v. North River Ins. Co.*, 486 F. Supp.2d 1366, 1368-69 (N.D. Ga. 2007) ("The first filed rule provides that when parties have instituted competing or parallel litigation in separate courts, the court initially having jurisdiction should hear the case.") (citations and internal quotations omitted).[12]  Although this rule has exceptions, particularly in the context of declaratory judgment actions, the Eleventh Circuit places the burden on the party opposing application of that rule to show "compelling circumstances" that warrant an exception.  *Manuel*, 430 F.3d at 1135; *see also Marietta Drapery*, 486 F. Supp.2d at 1369 ("In the Eleventh Circuit, the party objecting to

---

     [11]    *See also Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1324-25 (11th Cir. 2005) (explaining that district court's exercise of authority to proceed in declaratory judgment action is reviewed for abuse of discretion and that there is a zone of choice within which trial courts may go either way); *Prudential Ins. Co. of America v. Doe*, 140 F.3d 785, 789 (8th Cir. 1998) ("The Supreme Court's decision in *Wilton* ... vests the district courts with broad discretion in deciding whether to hear a declaratory judgment action.").

     [12]    The purposes of this rule are to prevent interference between coordinate federal courts, to avert duplicative litigation, and to minimize the risk of inconsistent results.  As one appellate court explained, "The federal courts long have recognized that the principle of comity requires federal district courts – courts of coordinate jurisdiction and equal rank – to exercise care to avoid interference with each other's affairs. ... As between federal district courts, ... the general principle is to avoid duplicative litigation. ...  The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."  *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24, South Atlantic and Gulf Coast Dist. of ILA, AFL-CIO*,  751 F.2d 721, 728-29 (5th Cir. 1985) (citations omitted); *see also Government Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) (federal court "should discourage litigants from filing declaratory actions as a means of forum shopping; and it should avoid duplicative litigation").

jurisdiction in the first-filed forum [must] carry the burden of proving 'compelling circumstances' to warrant an exception to the first-filed rule.") (citation omitted).

        2.    *The Anticipatory Filing Exception.*

To shoulder his burden of offering compelling circumstances militating against application of the first-filed rule, Dr. Cooney first invokes the anticipatory filing exception.  It has long been recognized in this Circuit that a district court has discretion to "decline to entertain a declaratory judgment action on the merits when a pending proceeding in another court will fully resolve the controversy between the parties. ... One equitable consideration in such decision is whether the declaratory judgment action was filed in apparent anticipation of the other pending proceeding." *Ven-Fuel, Inc. v. Department of the Treasury*, 673 F.2d 1194, 1195 (11th Cir. 1982) (citations omitted).

Dr. Cooney urges this Court to follow *Ven-Fuel* and dismiss the declaratory judgment claim as having been filed in anticipation of the Minnesota Action.  The Court declines to do so. Nothing in the circumstances of the filing of the Alabama Action suggests that the Former Stockholders were participating in an illicit race to the courthouse for some actual or perceived forum-shopping advantage.  There is no evidence that the Former Stockholders lied to or misled Dr. Cooney, or engaged in stall tactics to lull him into a false sense of security as they finalized and filed their Complaint while his gaze was averted.[13]  They were certainly under no obligation to advertise their intentions to Dr. Cooney ahead of time, and he could not reasonably have relied on their silence to mean that they were not preparing to sue him.  Moreover, the impetus for the

---

       [13]     This fact renders unpersuasive defendant's reliance on *Eveready Battery Co. v. Zinc Products Co., Div. of Alltrista Corp.*, 21 F. Supp.2d 1060 (E.D. Mo. 1998), wherein the court explained that compelling circumstances not to follow the first-filed rule exist when the plaintiff in the first-filed action "was able to file first only because it misled the filer of the second-filed action as to its intentions regarding filing a law suit." *Id.* at 1062.  Nothing in the facts presented by the parties suggests that the Former Stockholders misled Dr. Cooney regarding their intentions vis a vis filing a lawsuit.  Nor is defendant's citation to *Eveready* for the proposition that the first-filed rule should not penalize parties for their efforts to settle matters out of court availing here.  The facts do not reflect that Dr. Cooney was engaged with any settlement negotiations with the Former Stockholders when they filed the Complaint, much less that the Former Stockholders manipulated any such negotiations as a ruse to buy time to finalize and file the Complaint.

Former Stockholders to file their lawsuit was Dr. Cooney's sudden re-appearance after having severed all contact with SurModics and the Former Stockholders for the previous seven months. Until he re-established contact in May 2007, the Former Stockholders had no reason to know whether there was, in fact, a live case or controversy between them and Dr. Cooney.  For all they knew, when negotiations failed for the last time, he had simply abandoned the matter, as discouraged parties often do when confronted with the expense and inconvenience of litigation. Only on May 16, 2007, after being sent a copy of Dr. Cooney's draft complaint (from SurModics, not from Dr. Cooney), did the Former Stockholders have reason to believe that the dispute with Dr. Cooney remained in play.  They filed their Complaint in this action promptly thereafter, as was their right, because they had no interest in allowing this dispute to fester, unresolved, for an indefinite period of time, particularly with their $3.0 million milestone payment from SurModics tied up in escrow pending resolution of Dr. Cooney's dissatisfactions.

None of this is intended to minimize or overlook the fact that Dr. Cooney burst back into the spotlight in May 2007 by threatening suit, and that plaintiffs filed their Complaint a short time later.  Courts have found that filing a lawsuit in response to such a threat constitutes the kind of anticipatory filing for which a court may be justified in declining to hear a declaratory judgment action.  *See Ven-Fuel*, 673 F.2d at 1195 (district court did not abuse discretion in dismissing declaratory judgment claim filed one day after opposing party informed plaintiff that it would institute judicial proceedings unless the plaintiff paid a penalty "forthwith").  But this case is different.  Dr. Cooney had been threatening litigation for more than a year, without ever taking action.  Back in January 2006 (some 16 months before the Alabama Action was filed), his lawyer told the Former Stockholders' counsel that he was drafting a complaint, and even identified the causes of action he intended to pursue and the damages he intended to seek. Similar threats of immediate legal action were proffered by Dr. Cooney's counsel repeatedly during the first half of 2006 in an apparent negotiating tactic.  When that strategy failed, he did not follow through.  Like the boy who cried wolf, Dr. Cooney's constant threats of litigation ceased being credible long before May 2007.  Given these unique circumstances, the Former Stockholders had no reason to believe that the May 2007 draft complaint circulated by Dr. Cooney's counsel was anything more than a continuation of the "cry wolf" ploy crafted as a springboard for renewed settlement negotiations.  There is no indication that Dr. Cooney's

counsel was on the verge of filing that draft complaint as of May 2007; to the contrary, counsel admits telling SurModics' counsel that he was sending a draft complaint "as a final effort to resolve the dispute."  (Vickrey Aff., ¶ 2.)  The Former Stockholders had heard those sorts of dire warnings before from Dr. Cooney's prior lawyers, but nothing had ever become of them, and plaintiffs had no reason to believe that this time was any different.  Under these unique circumstances, the Former Stockholders' decision to file suit was not an illicit race to the courthouse to beat Dr. Cooney to the punch.  Stated more formally, the Court finds that this action is not anticipatory of the Minnesota Action, which plaintiffs had no reason to believe was imminent.  *See generally Kim v. Kim*, 324 F. Supp.2d 628, 636-37 (E.D. Pa. 2004) (declining to deviate from first-filed rule where "the parties' correspondence is consistent with the saber-rattling attendant to the demise of many business relationships" and where there was no evidence of any bad faith or improper conduct by the first-filing plaintiff).

       That is not to say, of course, that the Former Stockholders had no reason to believe there was a *bona fide* dispute between them and Dr. Cooney as of May 22, 2007.  They unquestionably did.  But that knowledge does not automatically render the Former Stockholders' filing anticipatory and improper, as Dr. Cooney would have the Court conclude.[14]  To the contrary, the Eleventh Circuit distinguishes between knowledge of a case or controversy and an imminent threat of litigation.  *See Manuel*, 430 F.3d at 1137 ("While there undoubtedly was a reasonable apprehension that a controversy existed sufficient to satisfy the constitutional requirements for a declaratory judgment action, this is not equivalent to an imminent threat of litigation.").  The latter justifies declining to entertain a declaratory judgment action, but the former is an essential prerequisite to the court's power to hear a claim.  *Id.*  Defendant's

---

[14]     Dr. Cooney's argument is that the anticipatory filing exception is triggered simply because plaintiffs' counsel "understood that Dr. Cooney was prepared to proceed with litigation" and because plaintiffs' counsel "was reaching out to Dr. Cooney's attorney on May 18, 2007 for the ostensible reason of needing information."  (Reply Brief (doc. 17), at 2, 5.)  Thus, defendant would have this Court find improper forum-shopping anytime a plaintiff files a declaratory judgment action on the understanding that the other side "was prepared to proceed with litigation" and anytime there had been communication between counsel concerning possible claims.  Such a broad rule would sweep the overwhelming majority of declaratory judgment actions into the anticipatory filing exception, which is not the law in this Circuit.

argument conflates the two.  If the Court were to accept Dr. Cooney's position, then "each time a party sought declaratory [judgment] in one forum, a defendant filing a second suit in a forum more favorable to defendant could always prevail under the anticipatory filing exception."  *Id.* (citation omitted).  That is simply not the law.

Given its conclusion that the Alabama Action does not constitute an anticipatory filing, the Court finds that Dr. Cooney's forum-shopping contention does not arise to the level of a compelling circumstance warranting an exception to the first-filed rule.[15]

> 3. *Other Equitable Factors.*

Aside from the anticipatory filing exception, Dr. Cooney references a panoply of other equitable factors that he says warrants this Court declining to hear the declaratory judgment cause of action.  The Eleventh Circuit has "previously recognized convenience of the parties and forum's connection with the controversy as relevant, albeit nonexclusive, factors" in deciding whether to hear such a claim.  *Manuel*, 430 F.3d at 1135.  Dr. Cooney also cites federal decisions from other jurisdictions examining such factors as the convenience and availability of witnesses, the absence of jurisdiction over all necessary or desirable parties, the possibility of consolidation with related litigation, the convenience of the parties, judicial economy and the risk of inconsistent rulings.  *See Genentech v. Eli Lilly and Co.*, 998 F.2d 931, 938 (Fed. Cir. 1993); *Serco Services, Co. v. Kelley Co.*, 51 F.3d 1037, 1039-40 (Fed. Cir. 1995); *Eveready Battery Co. v. L.P.I. Consumer Products, Inc.*, 464 F. Supp.2d 887, 892 (E.D. Mo. 2006).

Although Dr. Cooney cites authority for many of these factors, he offers minimal analysis of them in seeking dismissal of the first-filed declaratory judgment claim.  He states that SurModics (a Minnesota resident) is the real party in interest with regard to the patent inventorship issues joined in the declaratory judgment cause of action because SurModics, and

---

[15]      Even if the Court agreed with Dr. Cooney that the Alabama Action was filed in anticipation of the Minnesota Action, that determination would not automatically require dismissal of the declaratory judgment claim.  *See Manuel*, 430 F.3d at 1135 ("Even if a court finds that a filing is anticipatory, this consideration does not transmogrify into an obligatory rule mandating dismissal.").  Rather, that finding would constitute only "one equitable factor among many that a district court can consider in determining whether to hear a declaratory judgment action."  *See id.* at 1135-36.  As stated *infra*, defendant has not shown that those other equitable factors favor dismissing the Former Stockholders' declaratory judgment claim.

not the Former Stockholders, owns the intellectual property covered by those patents and patent applications.  To the extent that defendant intends to argue that the Former Stockholders lack standing, that argument is meritless, given the undisputed facts that they have a direct economic interest in the integrity of those patents and licensing arrangements, which interest has been impaired by the withholding of seven-figure payments to them from SurModics because of Dr. Cooney's actions.  *See generally Chou v. University of Chicago*, 254 F.3d 1347, 1359 (Fed. Cir. 2001) (party has suffered an injury-in-fact when it has been deprived of interest in proceeds in licensing invention as well as stock ownership because of defendant's alleged conduct).  To the extent that defendant's point is that this Court would lack personal jurisdiction over SurModics, he has made no showing to that effect.  The same goes for Signe Varner and Peter Corless, both of whom are named defendants in the Minnesota Action, but not parties here.  Defendant hypothesizes that these individuals might not be subject to personal jurisdiction in this forum, but offers no basis for so concluding.  The Court will not dismiss the declaratory judgment claim based on mere guesswork or speculation.

The only other equitable factor that Dr. Cooney discusses in the section of his brief seeking dismissal of the declaratory judgment claim is the fact that the 2005 Merger Agreement between InnoRx and SurModics contains a provision in which the Former Stockholders agreed to jurisdiction and venue in the District of Minnesota.  Although Dr. Cooney reiterates this point on several occasions, his reasoning for believing this helps his cause is opaque.  That the Former Stockholders agreed to litigate disputes with SurModics arising from the Merger Agreement in Minnesota says nothing about the propriety of an Alabama forum for this declaratory judgment action.  The Former Stockholders are not suing SurModics under the Merger Agreement, so the forum selection clause is inapplicable.  Dr. Cooney was not a party to that Merger Agreement, and does not contend otherwise.  He cannot avail himself of a contractual provision set forth in an agreement to which he is a stranger, in the absence of some showing (which he has not made) that he was an intended beneficiary.  Therefore, the forum selection clause contained in the Merger Agreement is devoid of analytical significance to the question of whether the first-filed

rule should apply here.[16]

        For all of these reasons, the undersigned finds that this action is subject to the first-filed rule and that Dr. Cooney has failed to satisfy his burden of proving compelling circumstances to warrant an exception to that rule.  Although his primary contention is that this action represents an anticipatory filing, the record reveals no evidence of improper forum shopping by the Former Stockholders in initiating this action here.  Dismissal of the declaratory judgment cause of action is inappropriate on that basis.

                    *4.        Case or Controversy Requirement.*

        Separate and apart from his arguments that the exercise of jurisdiction over the declaratory judgment action would be inequitable, Dr. Cooney maintains that the specific declarations at issue warrant dismissal of the claim for failure to satisfy the case or controversy requirement.  *See generally Malowney v. Federal Collection Deposit Group*, 193 F.3d 1342, 1347 (11th Cir. 1999) ("Consistent with the 'cases' and 'controversies' requirement of Article III, the Declaratory Judgment Act ... specifically provides that a declaratory judgment may be issued only in the case of an 'actual controversy.'") (citation omitted).  To satisfy the "case or controversy" prerequisite of both Article III of the U.S. Constitution and 28 U.S.C. § 2201, the facts alleged must show "a substantial continuing controversy between parties having adverse legal interests," and that continuing controversy "may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury."  *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985).

        With respect to the first three declarations requested by the Former Stockholders in Count I of the Complaint, defendant insists that he does not dispute their veracity and there is therefore no actual controversy pertaining to those matters.  In particular, the Complaint requests the following declarations: "(a) that no agreement or contract exists between InnoRx and Dr.

_____

        [16]        With respect to the equitable factors mentioned in *Manuel*, there is no reason to believe that a Minnesota forum would be any more convenient for the parties than an Alabama forum.  Dr. Cooney is a New York resident, and some (but by no means all) of the Former Stockholders are Alabama residents.  No party is a Minnesota resident.  And Alabama clearly has some nexus to the controversy, inasmuch as InnoRx was headquartered here throughout the time of Dr. Cooney's involvement and some plaintiffs reside here.

Cooney other than the Consulting Agreement, which has expired; (b) that Dr. Cooney has been

fully compensated for services he provided to InnoRx pursuant to the Consulting Agreement;

[and] (c) that there is not and never has been any contract or agreement that entitles Dr. Cooney

to an equity share, financial stake or any other ownership interest or right in InnoRx, SurModics

or any successor entity." (Doc. 1, ¶ 65(a)-(c).) Dr. Cooney has unequivocally represented to this

Court that he does not contest any of those statements.[17] Plaintiffs have offered no response

suggesting that the declarations requested in Paragraph 65(a), (b) and (c) of the Complaint

satisfy the "case or controversy" requirement. Accordingly, the Court finds that there is no *bona

fide* dispute between the parties as to the declarations requested in Paragraph 65(a), (b) and (c) of

the Complaint, and that dismissal of those aspects of Count I is warranted under both Article III

and 28 U.S.C. § 2201, both of which require actual, continuing controversies in declaratory

judgment claims.

The remaining five requests for declaratory relief set forth in Paragraph 65 of the

Complaint concern such matters as whether Dr. Cooney is entitled to any proceeds of the

SurModics sale or any other compensation from the Former Stockholders or SurModics

(Paragraph 65(d)); whether Chambers, Dr. de Juan, Varner or SurModics defrauded Dr. Cooney

(Paragraph 65(e)); whether Dr. de Juan or InnoRx breached any fiduciary duty to Dr. Cooney

(Paragraph 65(f)); whether Dr. Cooney assigned all rights in the patents to Johns Hopkins and

agreed that Johns Hopkins was the final arbiter of inventorship rights for those patents

(Paragraph 65(g)); and whether Dr. Cooney holds any inventorship rights in any patents licensed

to or acquired by SurModics (Paragraph 65(h)). Dr. Cooney's position is that there is no actual

---

[17] In the body of his brief, Dr. Cooney states that he "does not maintain that any such agreement exists" entitling him to any proceeds from the SurModics transaction. (Doc. 14, at 12.) In an accompanying chart broken down by declaration, defendant writes "Dr. Cooney does not allege otherwise; no controversy" with regard to Paragraph 65(a) and (c), and further writes "Dr. Cooney does not allege that he is owed more money for services he provided under the consulting agreement ... no controversy" with regard to Paragraph 65(b). (Doc. 14, Exh. F, at 1.) Defendant is bound by these representations, and will be held to them. *See generally New Hampshire v. Maine*, 532 U.S. 742, 749-50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (describing doctrine of judicial estoppel where party takes position inconsistent with earlier position that it previously persuaded a court to accept). Therefore, there is no need for this litigation to proceed as to the requested declarations set forth in Paragraph 65(a)-(c) of the Complaint.

controversy between him and the Former Stockholders on any of these matters because plaintiffs' requested declarations concern the rights of InnoRx (which no longer exists and is not a party), SurModics (which is not a party), and Varner (who is not a party), and because plaintiffs purportedly lack standing to contest his inventorship claims on the patents.

Defendant is of course correct that SurModics, Varner and InnoRx itself are not parties; however, that fact is not dispositive of whether a real dispute exists between Dr. Cooney and the Former Stockholders as to the matters listed. Several other facts weigh heavily in favor of the opposite conclusion. First, Paragraphs 65(d) - (g) all on their face involve disputes that are directly between Dr. Cooney and one or more Former Stockholders. That certain other individuals' or entities' interests might also be implicated by those claims in no way strips those claims of "case or controversy" status as between Dr. Cooney and the Former Stockholders. There is a real, actual dispute between plaintiffs and defendant as to each of the matters alleged in Paragraphs 65(d) through 65(g). Second, defendant ignores § 6.2 of the Merger Agreement, in which the Former Stockholders agreed to indemnify and hold harmless SurModics from any claim or demand by any third party, with SurModics having the right to withhold contingent payments if the Former Stockholders failed to comply. Plaintiffs contend that SurModics has exercised that right based on Dr. Cooney's claims of co-inventorship and a right to merger proceeds, such that the Former Stockholders have been (at least temporarily) deprived of some $3 million in milestone payments from SurModics to date, with a potential deprivation of $24 million in future payments, all as a direct result of Dr. Cooney's contentions that he invented the technology and is entitled to merger proceeds. (Indeed, plaintiffs have alleged that this deprivation was Dr. Cooney's intention all along as a means of gaining leverage in his quest to extract funds from plaintiffs.) Such a direct, substantial economic injury unquestionably gives rise to an injury-in-fact sufficient to permit the Former Stockholders to sue Dr. Cooney for declaratory relief on all of the matters recited in Paragraph 65(d) through 65(h). *See Chou*, 254 F.3d at 1359 ("If Chou has indeed been deprived of an interest in proceeds from licensing the invention and in stock ownership by the conduct that she alleges, then she will have suffered an

injury-in-fact, *i.e.*, the loss of those benefits.").[18]

**B.      The Tortious Interference Claim.**

Next, the Court turns to Count II of the Complaint, wherein the Former Stockholders allege that Dr. Cooney has tortiously interfered with the contractual relationship between plaintiffs and SurModics.  According to the Complaint, such interference has taken the form of repeated threats by Dr. Cooney from 2005 through the present to assert baseless claims against the Former Stockholders and SurModics for proceeds of the merger, for additional compensation for his work at InnoRx, and for inventorship credit on certain patents and patent applications transferred or licensed to SurModics via the merger.  The Complaint alleges that the effect of such interference has been that SurModics has delayed contingent payments otherwise owed to plaintiffs under the terms of the Merger Agreement.

In seeking to have Count II dismissed or stayed, defendant submits the following

---

[18]      Two other arguments posited by Dr. Cooney on the case or controversy issue warrant passing mention.  First, in Paragraph 65(g), plaintiffs seek a declaration that Dr. Cooney "agreed to allow Johns Hopkins to be the final arbiter of any decisions regarding inventorship rights for those patents."  (Doc. 1, ¶ 65(g).)  Defendant apparently argues that there is no case or controversy on this point because any such agreement would be superseded by the § 256 mechanism for judicial correction of inventorship; however, the enforceability of any such agreement is not encompassed by Paragraph 65(g) and is an entirely distinct question from whether there is a real dispute between the parties as to whether Dr. Cooney entered into such an agreement.  More importantly, defendant offers no authority for the proposition that a party cannot by contract designate a private party to be the final arbiter of inventorship rights, notwithstanding the § 256 mechanism.  The law is rife with examples of statutory and other legal rights that a party may waive by contract, and Dr. Cooney has provided this Court with no legal basis for concluding that such waivers are unenforceable in this context.  This Court will not perform defendant's legal research for it.  Defendant has failed to make an adequate showing to support his request for dismissal on this basis.  Second, defendant suggests in a *de facto* sur-reply that the patent applications are beyond the scope of the Merger Agreement's indemnity provision because those applications post-date the Agreement.  (Doc. 19, at 1.)  Without a much more comprehensive showing on a motion for summary judgment or at trial, the Court cannot ascertain whether those applications and the inventions they cover are or are not within the ambit of the indemnity provision.  Certainly, defendant has offered no evidence tending to prove that they are not, and the mere timing of those patent applications does not prove whether the technologies and inventions they cover were transferred or licensed to SurModics via the merger.  Defendant has not shown that plaintiffs' requests for declaratory relief relating to those patent applications must necessarily fail; therefore, dismissal of those requests at this time would be premature.

arguments: (i) under Minnesota law, a claim for tortious interference requires that a plaintiff plead and prove an actual breach of the underlying contract, which has not happened here; and (ii) under Alabama law, plaintiffs cannot satisfy the interference element of the claim, inasmuch as Dr. Cooney merely asserted claims during settlement negotiations and evidence of those statements is inadmissible under the Federal Rules of Evidence.[19]

1.   <em>Defendant Has Failed to Show that Minnesota Law Applies.</em>

The parties disagree as to which state's law applies to the tortious interference claim. Defendant seeks the benefit of Minnesota law, which requires a breach of the underlying contract in order to recover on a tortious interference theory. *See Peterson v. County of Dakota, Minn.*, 479 F.3d 555, 559 (8th Cir. 2007) (tortious interference claim under Minnesota law requires plaintiff to show, *inter alia*, that the alleged wrongdoer intentionally procured the underlying contract's breach). There is no allegation here that Dr. Cooney has caused a breach of the Merger Agreement; rather plaintiffs' claim is that Dr. Cooney's wrongful actions prompted SurModics to invoke the escrow provision to withhold millions of dollars in milestone payments that would otherwise be due and owing to plaintiffs. Thus, if defendant is correct that Minnesota law applies, then Count II fails as a matter of law and should be dismissed because plaintiffs cannot establish a required element of the claim.

Federal courts sitting in diversity generally apply the choice-of-law rules of the state in which they sit. *See Grupo Televisa, S.A. v. Telemundo Communications Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) ("A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state."); *Manuel*, 430 F.3d at 1139 (same). In that regard, both sides agree that the undersigned should look to Alabama choice-of-law rules as set forth in *Fitts v. Minnesota Mining & Mfg. Co.*, 581 So.2d 819 (Ala. 1991). (Opposition Brief (doc. 16), at 11-

---

[19]   Defendant also makes a third argument for dismissal of the tortious interference claim, to-wit: that this claim is redundant of the declaratory judgment claim, and should be stayed or dismissed for the same reasons presented with respect to Count I. Of course, the Court has determined *supra* that plaintiffs may proceed with their declaratory judgment cause of action in this case; therefore, even if defendant is correct that Count II simply repackages Count I as a separate tort, this argument would not favor dismissal because the Court has rejected defendant's attempts to dismiss or stay Count I and the relief sought by those two causes of action is distinct.

12; Reply Brief (doc. 17), at 8-9.)[20]   The *Fitts* court explained that "*Lex loci delicti* has been the rule in Alabama for almost 100 years.  Under this principle, an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred."  *Fitts*, 581 So.2d at 820 (refusing plaintiff's entreaties to abandon that rule in favor of newer, "modern" approach); *see also Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1308 (11th Cir. 2004) (finding that Alabama continues to apply traditional doctrine of *lex loci delicti* to tort claims).  Thus, "it is not the site of the alleged tortious act that is relevant, but the site of the injury, or the site of the event that created the right to sue."  *Glass v. Southern Wrecker Sales*, 990 F. Supp. 1344, 1347 (M.D. Ala. 1998).

So where did the injury occur?  Defendant says it must have been in Minnesota because "Dr. Cooney published his claims to SurModics in a mediation in Minneapolis," which "also is where SurModics elected to withhold payment due to the claim."  (Reply Brief, at 9.)  Plaintiffs say that "*lex loci delicti* [*sic*] points to Alabama's law of torts" (Opposition Brief, at 12), but offer no explanation or reasoning to justify that conclusion.  The problem is particularly knotty here because (a) the allegedly interfering acts by Dr. Cooney consisted of a pattern of conduct occurring over a two-year period through communications made at farflung locales, such as mediations in Georgia and Minnesota, physician seminars in Hawaii, and via communications directed at Chambers in Alabama, Dr. de Juan in California, SurModics in Minnesota, and their respective counsel wherever they may be found; and (b) the Former Stockholders are not all

---

[20]    In acknowledging that *Fitts* provides the rule for determining which state's substantive law applies to Count II, defendant apparently retreats from his position that Minnesota law governs because plaintiffs signed a Merger Agreement in which they agreed to a Minnesota choice-of-law provision.  Of course, that plaintiffs may have agreed as a matter of contract that Minnesota law would govern any disputes with SurModics regarding the Merger Agreement does not warrant the vast inferential leap that they agreed that Minnesota law would apply to tort claims brought against third parties for allegedly interfering with that Agreement.  The Agreement's choice-of-law provision has no application to tort claims brought against third parties.  *See generally Grupa Televisa*, 485 F.3d at 1244 (applying Florida law for proposition that, unlike contract actions, "[w]ith tort law, there is no agreement, no foreseen set of rules and statutes which the parties had recognized would control the litigation"); *Williams v. Norwest Financial Alabama, Inc.*, 723 So.2d 97, 101 (Ala.Civ.App. 1998) (choice-of-law provision in contract does not supersede *lex loci delicti* rule where claim is brought in tort, not contract, and arises from facts and circumstances surrounding the making of the agreement).

residents of a single state, but are apparently scattered across multiple states, including Alabama, California, Maryland, and others, such that injury has been felt in a number of different states as a result of defendant's alleged conduct.

Defendant's proposed solution to the quandary is to say that the injury must have occurred in Minnesota because in July 2006, Dr. Cooney attended a mediation in Minnesota at which he "presented the claims which [he has] raised in the Minneapolis Action, including [his] claims for correction of inventorship."  (Dr. Cooney Decl. (doc. 17, Exh. A), ¶¶ 1-2.)  Defendant would apparently have this Court look to the location of the tortious act, which Alabama courts have refused to do, as discussed *supra*.  Also, defendant does not say that this was the first time he articulated those claims, nor does he present evidence or argument tending to suggest that his statements at that mediation were the ones that caused SurModics to withhold milestone payments.   Further, the Court is aware of no factual basis why Count II must be triggered by the Minnesota mediation, as opposed to Dr. Cooney's other conduct in other places.  Indeed, defendant has indicated that he does not dispute that he articulated his claims for the first time back in March 2005 via letters to Dr. de Juan in California and to Chambers in Alabama.  (Docs. 18 & 19.)  More importantly, the July 2006 mediation could not have been a trigger for the withholding of payments by SurModics, because it appears that SurModics notified the Former Stockholders back in April 2006 (three months <u>before</u> the July 2006 mediation) that the milestone payment would be placed into escrow pending resolution of Dr. Cooney's claims. (Chambers Aff., ¶ 7.)

Defendants' showing is inadequate to establish that the injury complained of in Count II occurred in Minnesota.  Under a *lex loci delicti* regime, the place of injury "is the locale in which the last event necessary to make a defendant liable for an alleged tort occurs."  *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp.2d 554, 555 (M.D.N.C. 1999); *see also Velten v. Regis B. Lippert, Intercat, Inc.*, 985 F.2d 1515, 1521 (11th Cir. 1993) ("The place of the wrong is the jurisdiction where the harm was suffered or where the last event necessary to make an actor liable for the alleged tort takes place.").  Where, as here, the injury in question is financial, the location where the financial injury was felt is determinative under *lex loci delicti*.  *The Bradbury Co. v. Teissier-duCros*, 387 F. Supp.2d 1167, 1173 (D. Kan. 2005) (for claim of tortious interference, where the injury is financial and the injured parties are citizens of Georgia, the

-21-

financial injury was felt in Georgia and Georgia law applies); *Rhone-Poulenc*, 73 F. Supp.2d at 555 ("[T]he state where the injury occurred in a fraud claim is the state in which the plaintiff suffered the economic impact."); *Glass*, 990 F. Supp. at 1348 ("courts consistently conclude that the state where the injury occurred in a fraud claim is the state in which the plaintiff suffered the economic impact").  Indeed, "the injury to the plaintiff is technically the 'last event' required to make a defendant liable."  *Rhone-Poulenc*, 73 F. Supp.2d at 555 n.2.  Defendant has proffered no evidence tending to show that the injury to the Former Stockholders occurred in Minnesota, that the plaintiffs suffered economic impact in Minnesota from the alleged tortious interference, or that any plaintiffs are Minnesota residents.[21]  Therefore, defendant has not made an adequate showing to support his argument on his Motion to Dismiss that Minnesota law applies to the tortious interference cause of action.[22]

---

[21]     Instead, defendant cites *Grupa Televisa* for the proposition that the Second Restatement places particular importance on the place where the conduct occurred when injury occurs in two or more states.  (Reply Brief, at 9-10.)  In contrast to the Florida choice-of-law rules operative in *Grupa Televisa*, however, Alabama has expressly refused to adopt the Second Restatement's approach but instead rigidly adheres to *lex loci delicti*.  *See Fitts*, 581 So.2d at 823; *compare Trumpet Vine Investments, N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115-16 (11th Cir. 1996) ("At least as to tort claims, the Florida Supreme Court has abandoned the traditional *lex loci delicti* rule in favor of the ... test set forth in the Restatement (Second)"); *Whatley v. Merit Distribution Services*, 191 F.R.D. 655, 660 (S.D. Ala. 2000) (observing that Alabama Supreme Court has declined to adopt Second Restatement approach but instead follows *lex loci delicti*).  As such, defendant's reliance on the Second Restatement is unhelpful and inconsistent with the Alabama choice-of-law principles that govern this inquiry.

[22]     While the foregoing is sufficient to reject defendant's contention at the Rule 12(b) stage that Minnesota law governs the tortious interference claim, the parties have not presented the Court with sufficient information or argument to fix affirmatively and conclusively which state's law should apply.  The inquiry is complicated by the fact that different plaintiffs are residents of different states (including, at a minimum, Alabama, California, and Maryland), such that the financial injury caused by the alleged interference does not appear to have been confined to just one state.  Plaintiffs' suggestion that Alabama law should apply because most of the Former Shareholders either live in or own property in Alabama is not satisfying, particularly in the absence of authority suggesting that the location of property ownership has any bearing on the choice-of-law issue.  To the extent that the parties cannot agree on which state's law should apply to these claims and wish to continue debating these arcane and esoteric matters, they should be prepared to submit on summary judgment evidence and legal argument supporting their respective positions on the proper application of *lex loci delicti* to these circumstances.  The

2. *Plaintiffs Have Stated a Viable Claim.*

Alternatively, defendant contends that even if Minnesota law does not apply, the tortious interference cause of action would necessarily fail because plaintiffs' only evidence of interference consists of statements made by Dr. Cooney in settlement negotiations, which are inadmissible under Rule 408, Fed.R.Evid.

Under Alabama law, one of the elements a plaintiff must prove to establish a *prima facie* case of tortious interference is "intentional interference by the defendant with the contract or business relation." *S.B. v. Saint James School*, 959 So.2d 72, 94 (Ala. 2006) (citation omitted). The Complaint clearly articulates numerous facts that, if proven, would satisfy this element. According to the Complaint, "[s]ince April 2005, Dr. Cooney has pursued a pattern of conduct premised on baseless claims in an enterprise, using lawful and unlawful means for an unlawful purpose to attempt to force [plaintiffs] and SurModics, to include him as an inventor on certain patents ... and to pay him substantial compensation." (Complaint, ¶ 49.) The Complaint specifically alleges that this interfering conduct was designed to "give Dr. Cooney leverage to extract a sizable payment from the Stockholders." (*Id.*) Based on this pattern of conduct, the Complaint alleges, "SurModics has placed into escrow the second contingent payment to the InnoRx Stockholders pending a potential judicial determination of Dr. Cooney's claims" (*id.*, ¶ 59), which amounts to interference with the Merger Agreement. Taken as a whole, the Complaint clearly alleges that Dr. Cooney engaged in a two-year campaign of making bogus claims to inventorship rights and merger proceeds with the purpose and intent of interfering with the administration of the Merger Agreement to such a degree that the Former Stockholders and/or SurModics might make a large payment to him to put an end to the interference. Simply put, plaintiffs' theory is that defendant intentionally disrupted the performance of the Merger Agreement by fabricating false claims intended to jeopardize the parties' contract and their efforts to develop the technology, effectively extorting them into paying money to silence him. Such allegations unquestionably rise to the level of wrongful interference sufficient to sustain a claim for tortious interference with contractual relations under Alabama law.

---

Court will not articulate the parties' arguments for them or guess as to what the evidence might show concerning the location of economic injury.

If the Court understands the Rule 12(b) Motion correctly on this point, defendant takes the position that the tortious interference claim should be dismissed because the evidence on which it is predicated consists of statements made by Dr. Cooney in settlement negotiations, which are inadmissible under Rule 408 of the Federal Rules of Evidence.[23]  This kind of evidentiary objection is inappropriate at the Rule 12(b) stage.  Despite defendant's repeated attempts to characterize the facts this way, nothing in the Complaint would confine Dr. Cooney's allegedly interfering conduct to statements made during a mediation.[24]  The pattern of conduct described in the Complaint as allegedly interfering with the Merger Agreement is far broader

---

[23]      This premise is highly suspect.  Certain courts have recognized that threats or other statements made during settlement negotiations are admissible, "to the extent they constitute an additional wrong, without implicating the strictures of Rule 408."  *Victor G. Reiling Associates and Design Innovation, Inc. v. Fisher-Price, Inc.*, 407 F. Supp.2d 401, 403 (D. Conn. 2006) (citation omitted); *see also Carney v. American University*, 151 F.3d 1090, 1095-96 (D.C. Cir. 1998) (although settlement letters are inadmissible to prove liability or amount, they "can be used to establish an independent violation (here, retaliation) unrelated to the underlying claim which was the subject of the correspondence"); *Armstrong v. HRB Royalty, Inc.*, 392 F. Supp.2d 1302, 1304-05 (S.D. Ala. 2005) ("Rule 408 unambiguously requires that the claim as to which a settlement offer was made and the claim at issue in the litigation in which the offer is proffered as evidence must be the same claim" for the evidence to be barred).

[24]      Defendant's contention is that "Dr. Cooney's alleged misconduct is his assertion of his claim, first in settlement negotiations."  (Defendant's Brief (doc. 14), at 14.)  He repeats this statement in his reply brief, arguing that "Plaintiffs' claim arises from Dr. Cooney's assertion of his claims in a formal mediation."  (Reply Brief, at 11.)  Nothing in the Complaint supports imposing such a temporal and spatial limitation on the tortious interference cause of action; to the contrary, the Complaint refers to a prolonged course of conduct.  To the extent that defendant would have the Court consider information outside the pleadings to support his construction of what events Count II is based upon, effectively converting the Motion to Dismiss into a motion for summary judgment on this issue, the Court declines to do so.  *See Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1267 (11th Cir. 2002) ("Whenever a judge considers matters outside the pleadings in a Rule 12(b)(6) motion, that motion is thereby converted into a Rule 56 Summary Judgment motion."); *Moss v. W&A Cleaners*, 111 F. Supp.2d 1181, 1185 (M.D. Ala. 2000) (declining to convert Rule 12(b)(6) motion to Rule 56 motion based on finding that it would be more appropriate to enter a scheduling order and allow the parties to conduct discovery); *Grillo v. John Alden Life Ins. Co.*, 939 F. Supp. 685, 686 (D. Minn. 1996) (disregarding affidavits submitted with motion to dismiss because "the court concludes that the parties are in no position to present all material pertinent to a motion for summary judgment"); *701 NPB Associates v. Federal Deposit Ins. Corp.*, 779 F. Supp. 1336, 1338 (S.D. Fla. 1991) (similar).

than that and was in no way limited to things Dr. Cooney said or did during formal mediation sessions. As such, even if defendant were correct that Rule 408 bars admission of defendant's statements during the Minneapolis mediation (a questionable proposition which the Court does not reach today), Count II still states a claim upon which relief can be granted because on its face it is not predicated exclusively on statements made by defendant during a mediation.[25]

### C. The Section 1404(a) Request.

In the alternative to dismissal or stay of this action, defendant requests that it be transferred to the U.S. District Court for the District of Minnesota, pursuant to 28 U.S.C. § 1404(a).

By its terms, § 1404(a) provides that an action may be transferred to another district where it might have been brought "[f]or the convenience of parties and witnesses, in the interest of justice." *Id.* When determining whether the balance of justice and convenience favors transfer, courts "generally consider the following factors: the plaintiff's initial choice of forum; the convenience of the parties; the convenience of the witnesses; the relative ease of access to sources of proof; the availability of compulsory process for witnesses; the location of relevant documents; the financial ability to bear the cost of the change; and trial efficiency." *Lasalle Bank N.A. v. Mobile Hotel Properties, LLC*, 274 F. Supp.2d 1293, 1301 (S.D. Ala. 2003) (citation omitted); *see also C.M.B. Foods, Inc. v. Corral of Middle Georgia*, 396 F. Supp.2d 1283, 1286-87 (M.D. Ala. 2005) (same). "The decision of whether a case should be transferred

---

[25] In his reply brief, defendant proffers a brand-new argument for dismissing Count II by asserting that it is a malicious prosecution claim in disguise and that plaintiffs cannot satisfy the elements of a malicious prosecution cause of action. (Reply Brief, at 10-11.) It would be unfair and improper to consider these newly raised arguments at this time, when defendant could have raised them earlier and plaintiffs have not had an opportunity to be heard on them. *See, e.g., Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 317 n.89 (S.D. Ala. 2006) ("this argument is not properly raised because plaintiffs submitted it for the first time in their reply brief"); *United States v. Feinberg*, 89 F.3d 333, 341 (7th Cir. 1996) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court."); *Sweet v. Pfizer*, 232 F.R.D. 360, 364 n.7 (C.D. Cal. 2005) ("the moving party in a motion cannot submit new information as part of its Reply"); *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F. Supp. 1511, 1515 (S.D. Fla. 1996) ("the Court finds that the movant may not raise new arguments in a reply brief"). Accordingly, the Court will not consider defendant's untimely malicious prosecution argument.

under § 1404(a) is an individualized case-by-case consideration of convenience and fairness."
*A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp.2d 1290, 1307 (N.D. Ala. 2003) (citations omitted);
*Lasalle Bank*, 274 F. Supp.2d at 1301 (similar).

Notwithstanding the foregoing laundry list of factors, however, a plaintiff's choice of
forum should be honored so long as venue is proper there, unless substantial countervailing
considerations militate to the contrary.  *See Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253,
260 (11th Cir. 1996) ("The plaintiff's choice of forum should not be disturbed unless it is clearly
outweighed by other considerations.").[26]  "[I]n the usual motion for transfer under section
1404(a), the burden is on the movant to establish that the suggested forum is more convenient."
*In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989); *Holmes v. Freightliner, LLC*, 237 F.
Supp.2d 690, 692-93 (M.D. Ala. 2002) (observing that, under § 1404(a) analysis, plaintiff's
selected forum is presumptively correct, and defendant bears burden of demonstrating that
suggested forum is more convenient).

Defendant has failed to meet his burden of showing that Minnesota would be a more
convenient forum than Alabama.  By all appearances, witnesses and documents relating to these
claims are scattered all over the country.  The inventorship aspects of the declaratory judgment
claim relate to work that Dr. de Juan and Dr. Cooney performed in Maryland, so there may well
be relevant documents and witnesses there.  Dr. de Juan continued his research in California
prior to the sale of InnoRx, with Dr. Cooney possibly performing consulting services for InnoRx
in North Carolina during part of that time.  There may be relevant documents and witnesses in
both of those locations.  Dr. de Juan now lives in California and Dr. Cooney in New York, and

---

[26]     This principle has been echoed by myriad district courts examining § 1404(a)
motions.  *See, e.g., Thermal Technologies, Inc. v. Dade Service Corp.*, 282 F. Supp.2d 1373,
1375 (S.D. Fla. 2003) ("Initially, Plaintiffs' choice of forum should rarely be disturbed."); *A.J.
Taft*, 291 F. Supp.2d at 1309 ("in this Circuit, a plaintiff's choice of forum typically is entitled to
considerable deference"); *Lasalle Bank*, 274 F. Supp.2d at 1301 ("Courts will accord great
deference to the plaintiff's choice of forum if the forum is in the district in which it resides.");
*Holmes v. Freightliner, LLC*, 237 F. Supp.2d 690, 693 (M.D. Ala. 2002) ("[T]he weight to be
given the plaintiff's forum choice is significant and will not be disturbed unless the other factors
weigh substantially in favor of transfer.") (citation omitted); *E.E.O.C. v. Mustang Mobile
Homes, Inc.*, 88 F. Supp.2d 722, 726 (W.D. Tex. 1999) ("In general, a plaintiff's choice of forum
is entitled to great weight.").

each of them may possess relevant documents.  InnoRx's former corporate headquarters is located in Alabama, and Chambers (its former president and CEO) resides in Alabama, so there may well be documents and witnesses germane to plaintiffs' claims in this state.  And SurModics is headquartered in Minnesota, so there are likely relevant documents and witnesses in that state as well.

Dr. Cooney has not demonstrated that these witnesses and documents are substantially likely to be concentrated in Minnesota, so as to tip the balance of justice and convenience in favor of that forum.  Although Dr. Cooney would couch plaintiffs' claims as being centered on events that occurred in Minnesota, such a characterization appears inaccurate.  Dr. Cooney and Dr. de Juan forged their working relationship in Maryland, and their dealings and research there will be critical to both the equity stake and inventorship aspects of this lawsuit.  They formed an Alabama-based company to commercialize this technology.  The original patent application for the helical coil invention appears to have been prepared in Maryland, with no Minnesota nexus.  While subsequent patent applications may have been prepared by SurModics in Minnesota, and SurModics may have made the decision to withhold milestone payments from plaintiffs in Minnesota, these facts constitute only a small portion of the story in this litigation.  In short, nothing the Court has seen to date suggests that it will be substantially more convenient from the standpoint of witnesses, documents and other sources of proof to litigate this matter in Minnesota, rather than in Alabama.

Defendant's other arguments in favor of transfer can be dispensed with quickly.  He argues that Minnesota is a more convenient forum for the parties than Alabama.  But it does not appear that a single litigant in this action is a Minnesota resident, whereas a number of them are Alabama residents.  Defendant's contention that Minnesota is no more inconvenient than Alabama for the parties misses the fundamental point that it is incumbent on him to show that Minnesota is a substantially more convenient forum, not that Minnesota and Alabama are equally inconvenient.  Additionally, defendant speculates that "whatever it was that prompted SurModics to withhold payment ... occurred at and within SurModics."  (Defendant's Brief, at 17.)  The Court is aware of no facts that would support such a conclusion, and will not transfer venue based on a mere guess that certain events must have happened in Minnesota.  Given the widely diffused nature of the events and witnesses in this case, there may well be availability of

process issues in both fora.  Contrary to defendant's position, however, there is no reason to believe that these concerns would be substantially attenuated in Minnesota as compared to Alabama.  Further, defendant's conclusory statement that he "lacks the means to litigate in two different fora" is unsupported by any evidence.  Even if it were true, the subsequently filed, substantially similar Minnesota Action is entirely his doing.  To the extent that it is financially taxing on him to litigate this action and the Minnesota Action concurrently, Dr. Cooney is in a financial bind of his own creation.  This factor does not favor transfer.  Defendant also asserts that the familiarity with governing law factor warrants transfer.  He is incorrect, as there is no reason to believe that Minnesota law applies to any claims in this action.  Contrary to Dr. Cooney's viewpoint, the plaintiffs' choice of forum obviously favors denial of transfer.  Plaintiffs selected an Alabama forum in this first-filed action, and that choice is entitled to considerable deference, even if Dr. Cooney had been planning to file his own lawsuit someplace else.  Finally, there is absolutely no basis in the evidence and argument before the Court for concluding that the interests of justice and trial efficiency would be bolstered if this action were to proceed in Minnesota rather than in Alabama.

For all of these reasons, the request to transfer this action to the District of Minnesota pursuant to 28 U.S.C. § 1404(a) is **denied** based on the Court's finding that the plaintiffs' choice of an Alabama forum is not clearly outweighed by other considerations.

### III.    Conclusion.

For all of the foregoing reasons, Defendant's Motion to Dismiss or Stay, or in the Alternative, to Transfer (doc. 13) is **granted in part**, and **denied in part**.  The Motion is **granted** with respect to the requests for declaratory judgment set forth in Paragraphs 65(a), 65(b) and 65(c) of the Complaint, and those aspects of the declaratory judgment claim are **dismissed** for want of an actual case or controversy.  In all other respects, the Motion is **denied**. Plaintiffs' Motion for Oral Argument (doc. 18) is **denied**.

Defendant is **ordered** to file an answer to the Complaint by **September 12, 2007**.

DONE and ORDERED this 29th day of August, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE